## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

MICHAEL DEANDRE WILLIAMS,

      Plaintiff,

v.                                  Case No. 2:19-cv-00067

TINA FOUTS-SNEED, *et al.*,

      Defendants.

## PROPOSED FINDINGS AND RECOMMENDATION

This matter is assigned to the Honorable John T. Copenhaver, Jr., Senior United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition pursuant to 28 U.S.C. § 636(b)(1)(B).

### I.    RELEVANT PROCEDURAL HISTORY

The only remaining claims in this matter are an Eighth Amendment deliberate indifference claim for monetary damages against Defendants Tina Fouts-Sneed ("Fouts-Sneed") and Jessica Thornhill ("Thornhill") (collectively "the PrimeCare Defendants") and a First Amendment retaliation claim for monetary damages against Defendant J.T. Binion ("Binion").  Pending before the court are cross-motions for summary judgment filed by the parties.  Specifically, on November 15, 2023, Binion filed a Motion for Summary Judgment (ECF No. 76) and Memorandum of Law in support thereof (ECF No. 77).  That same date, the PrimeCare Defendants also filed a Motion for Summary Judgment (ECF No. 78) and Memorandum of Law in support thereof (ECF No. 79).  On

November 16, 2023, the undersigned entered an Order and Notice, pursuant to the holding in *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying the *pro se* Plaintiff of his right and obligation to file a response to the Defendants' motions for summary judgment, and of the type of evidence required to oppose such motions. (ECF No. 80).

On November 21, 2023, Plaintiff filed his own Motions for Summary Judgment (ECF Nos. 82 and 83). Defendant Binion responded to Plaintiff's motions for summary judgment on December 5, 2023. (ECF No. 89). Plaintiff initially responded to Defendants' motions on December 12, 2023. (ECF Nos. 90 and 91). Plaintiff then filed additional responses to both Defendants' motions on December 22, 2023. (ECF Nos. 93 and 94). On January 8, 2024, Plaintiff filed a reply to Binion's response to his motion for summary judgment. (ECF No. 96). It does not appear that the PrimeCare Defendants filed a response to Plaintiff's motion for summary judgment or a reply to their own motion, choosing instead to rely on the evidence presented with their own motion.

Then, on January 18, 2024, the PrimeCare Defendants by counsel, filed a Suggestion of Bankruptcy (ECF No. 97), indicating that PrimeCare Medical of West Virginia, Inc. ("PrimeCare") had filed a voluntary petition under Chapter 7 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of West Virginia, Case No. 6:24-bk-60001. Although PrimeCare has been dismissed as a defendant herein, Fouts-Sneed and Thornhill, who were employed by PrimeCare, are being defended in this civil action under an insurance policy maintained by PrimeCare. Thus, they suggest that "all further proceedings" in this matter must be automatically stayed pursuant to 11 U.S.C. § 362. (*Id.*) The undersigned ordered additional briefing from the parties about whether the bankruptcy stay should extend to the non-debtor

defendants herein.  (ECF Nos. 98 and 106).  The positions of the parties in their briefing

(ECF Nos. 100, 102, 103, 104, and 107) will be discussed in greater detail in Section II A

*infra*.  These matters are ripe for resolution.

## II.    DISCUSSION

### A.    *Bankruptcy Stay*.

The automatic stay provision in 11 U.S.C. § 362 provides protection against, inter

alia, the following:

> (1) the commencement or continuation, including the issuance or
> employment of process, of a judicial, administrative, or other action or
> proceeding against the debtor that was or could have been commenced
> before the commencement of the case under this title, or to recover a claim
> against the debtor that arose before the commencement of the case under
> this title; * * *

> (3) any act to obtain possession of property of the estate or of property from
> the estate or to exercise control over property of the estate;

> 11 U.S.C. § 362(a)(1), (3).

*In re James F. Humphreys & Assocs., L.C.*, 558 B.R. 758, 762 (Bankr. S.D.W. Va. 2016).

§ 362(a)(1) generally applies only to the bankrupt debtor, not third-party defendants or

co-defendants.  However, in certain "unusual circumstances," the stay may be extended

to non-debtor defendants where there is such identity between the debtor and non-debtor

that the debtor may be considered to be the real party in interest, and that judgment

against the non-debtor would really be a judgment against the debtor.  *See A.H. Robins*

*Co., Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986) (hereinafter "*Robins*").  However,

this exception does not apply where the non-debtor defendant has "obligations that are

'independent' and primary, not derivative of those of the debtor."  *Holland v. High Power*

*Energy*, 248 B.R. 53, 58 (2000) (Copenhaver, J.) (quoting *O'Malley Lumber Co. v.*

*Lockard (In re Lockard)*, 774 F.2d 1171, 1179 (9th Cir. 1989)).

In *Robins*, the United States Court of Appeals for the Fourth Circuit addressed the "unusual circumstances" in which a bankruptcy stay under § 362 may be extended to non-debtor defendants. The *Robins* Court stated:

> [§ 362] (a)(1), which stays actions against the debtor and arguably against those whose interests are so intimately intertwined with those of the debtor that the latter may be said to be the real party in interest, is not the only part of section 362 providing for an automatic stay of proceedings. Subsection (a)(3) directs stays of any action, whether against the debtor or third parties, to obtain possession or to exercise control over property of the debtor. A key phrase in the construction and application of this section is, of course, "property" as that term is used in the Act. Section 541(a)(1) of the Bankruptcy Act defines "property" in the bankruptcy context. It provides that the "estate is comprised of all the following property, wherever located . . . all legal or equitable interests of the debtor in property as of the commencement of the case."

788 F.2d 994, 1001 (4th Cir. 1986). The Court further noted that the United States Supreme Court has construed this provision broadly to include "all kinds of property including tangible or intangible property, causes of action (see Bankruptcy Act § 70a(6)), and all other forms of property currently specified in section 70a of the Bankruptcy Act." *Id.,* quoting *United States v. Whiting Pools, Inc.*, 462 U.S. 198 (1983). The Court further noted that "insurance contracts have been said to be embraced in this statutory definition of "property." *Id.*, citing *In re Davis*, 730 F.2d 176, 184 (5th Cir. 1984). The Court also recognized a federal court's inherent power to stay a matter under its general equity authority to efficiently manage its docket. *Id.* at 1003 (other citations omitted).

A review of relevant case law demonstrates that the unusual circumstances exception turns, at least in part, on the issue of indemnification. In fact, the *Robins* Court specifically described one such circumstance warranting extension of the § 362 stay to a non-debtor defendant as "a suit against a third party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case." 788

F.2d at 999; *see also, e.g., Bouton v. Missouri*, No. 2:22-cv-00010-SPM, 2023 WL 3477935, at *3 (E.D. Mo. May 16, 2023) (denying extension of stay where record contained insufficient evidence of whether debtor corporation was actually under a legal obligation to defend or <u>indemnify</u> two employees and, thus, did not demonstrate an "immediate adverse economic consequence" on the bankruptcy estate); *Swallow v. Corizon, LLC*, No. 4:18-cv-1045 JMB, 2023 WL 2967785, at *2 (E.D. Mo. Apr. 17, 2023) (payment of doctors' defense <u>and indemnification of their liability by debtor</u> would result in an immediate adverse economic impact on bankruptcy estate; thus meeting "unusual circumstances" extending the bankruptcy stay to non-debtor defendants); *Keystone Drill Servs., Inc. v. Davey Kent, Inc.*, No. 3:21-cv-30, 2022 WL 819280, at *6 (W.D. Pa. Feb. 22, 2022) (denying extension of bankruptcy stay where non-debtor defendant did not show right to <u>absolute indemnification</u>); *Edwards v. McElliotts Trucking, LLC*, 3:16-cv-1879, 2017 WL 5559921, at *2-3 (S.D.W. Va. Nov. 17, 2017) (Chambers, J.) (granting stay to non-debtor defendant who <u>had indemnification agreement with debtor</u>, but recognizing that "district courts have been unable to achieve any substantial clarity regarding appropriate application of the exception."); *In re James F. Humphreys & Assocs., L.C.*, 558 B.R. 758, 763 (Bankr. S.D.W. Va. 2016) (Volk, B.J.) (recognizing that "[a]n illustration of such a situation would be a suit against a third-party who is entitled to <u>absolute indemnity</u> by the debtor on account of any judgment that might result against them in the case.") (emphasis added); *Forcine Concrete & Const. Co. v. Manning Equip. Sales & Serv.*, 426 B.R. 520 (E.D. Pa. 2010) (denying extension of bankruptcy stay because <u>no automatic right to absolute indemnification</u> and, thus, there would be no "immediate adverse economic consequence for the debtor's estate."); *Doyle v. Fleetwood Homes of Va., Inc.*, 2009 WL 1210697, at *2 (S.D.W. Va. Apr. 30, 2009) (Copenhaver, J.)

(finding that non-debtor defendants had not offered evidence that they would have been entitled to "<u>absolute indemnity</u>" as required by Robins and, accordingly, were not entitled to the benefits of the automatic stay); *Dunnam v. Sportsstuff, Inc.*, 2008 WL 200287, at *3 (E.D. Va. Jan. 23, 2008) (extending automatic stay to a non-debtor defendant where the non-debtor and debtor defendants had an agreement that "<u>unambiguously state[d]</u>" that the debtor defendant would <u>indemnify</u> the non-debtor defendant); *but see Holland v. High Power Energy*, 248 B.R. 53 (S.D.W. Va. 2000) (Copenhaver, J.) (declining to extend automatic stay even in face of indemnification agreement).

At the outset, it is apparent that PrimeCare's bankruptcy proceedings have no effect on Plaintiff's claim against Defendant Binion, who has no connection or relationship to PrimeCare. Binion agrees that "there are no 'unusual circumstances'" between PrimeCare and [him] sufficient to meet the test in *Robins*." (ECF No. 100 at 2). Accordingly, the bankruptcy stay will not be extended to the proceedings concerning Binion and the undersigned will proceed to review the pending motions concerning the claim against Binion herein.,

Turing to the claims against Fouts-Sneed and Thornhill, who are former employees of PrimeCare, it is apparent from the evidence presented that these defendants are being defended in this matter under an insurance policy maintained by PrimeCare that was in effect during the operative period at issue in Plaintiff's complaint, and that Fouts-Sneed and Thornhill appear to qualify as "persons insured" under the policy. However, upon review of the policy language and exclusions therein, it appears that coverage for damages may only extend to negligent acts, errors, or omissions, and not to intentional conduct, such as the deliberate indifference to serious medical needs claims alleged against Fouts-Sneed and Thornhill herein. (*See* ECF No. 107-1, Ex. A at 1 and 3, Section I, INSURING

AGREEMENTS, subsection 1, and Section IV EXCLUSIONS, subsection (a)).

The insurance policy distinguishes between "claims expenses" and "damages." "Claims expenses" are defined as:

> (1) reasonable and customary fees charged by an attorney(s) designated and agreed by the Underwriters in consultation with the Insured, but subject always to the Underwriters' final decision; and (2) all other fees, costs, and expenses resulting from the investigation, adjustment, defense, and appeal of a Claim, if incurred by the Underwriters, or by the Insured with the written consent of the Underwriters.

(*Id.* at 12, Section V, DEFINITIONS, subsection (d)).  Meanwhile, "Damages" are defined as :

> [C]ivil monetary judgment, award or settlement and does not include:  (1) the restitution of compensation and expenses paid to the Insured for services and goods; and (2) judgments or awards deemed uninsurable by law.

(*Id.*, subsection (e)).  The policy language suggests that, for intentional conduct such as that alleged against Defendants Fouts-Sneed and Thornhill, there is a duty to defend and pay "claims expenses," but not to pay "damages" that may be awarded and, thus, there appears to be no right to or agreement concerning "absolute indemnification" for the damages claims at issue herein.

Consequently, the instant circumstances do not appear to satisfy the conditions to meet the "unusual circumstances" necessary to extend the bankruptcy stay to Defendants Fouts-Sneed and Thornhill under § 362 or under the Court's general equitable powers. Therefore, the undersigned proposes that the presiding District Judge **FIND** that this matter should not be stayed during the pendency of PrimeCare's bankruptcy proceedings. Accordingly, the undersigned will proceed to review the pending motions involving Defendants Fouts-Sneed and Thornhill and propose recommended rulings thereon.

In his briefs concerning the bankruptcy stay (ECF Nos. 103 and 104), Plaintiff took no position concerning whether a stay was appropriate but sought legal advice from the Court about whether he is a creditor and could have counsel appointed in the bankruptcy proceeding.  This Court cannot give legal advice to a party and, thus, declines to address those matters herein.

      B.    *Cross-Motions for Summary Judgment.*

The Court now turns to the pending cross-motions for summary judgment filed by the parties herein.  (ECF Nos. 76, 78, 82, and 83).

      1.    Standard of Review.

In evaluating summary judgment motions, Rule 56(a) of the Federal Rules of Civil Procedure provides:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  Material facts are those necessary to establish the elements of a party's cause of action.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  The moving party has the burden of establishing that there is an absence of evidence to support the non-moving party's claim and summary judgment is required when the non-moving party fails to make a sufficient showing of an essential element.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 325 (1986).  To support their factual positions, the parties must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or  that the adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Once the moving party demonstrates such a lack of evidence, the non-moving party must go beyond the pleadings and make a sufficient showing of facts presenting a genuine issue for trial. *Celotex*, 477 U.S. at 325*; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). "A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements." *Brown v. Showboat Atlantic City Propoco, LLC*, No. 08-5145, 2010 WL 5237855, *2 (D.N.J. Dec. 16, 2010) (citing *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). Rather, "the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Id.* (citing *Anderson*, 477 U.S. at 256-57). Accordingly, summary judgment will generally be granted unless a reasonable jury could render a verdict for the non-moving party on the evidence presented. *Anderson,* 477 U.S. at 247-48.

A court must not resolve disputed facts or weigh the evidence and may not make credibility determinations. *Russell v. Microdyne Corp.,* 65 F.3d 1229, 1239 (4th Cir. 1995); *Sosebee v. Murphy,* 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and to have all internal conflicts resolved in his or her favor. *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United*

*States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). However, the party opposing the motion may not rely upon mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Sprenkle v. Hartford Life Ins. Co.,* 84 F. Supp.2d 751 (N.D.W. Va. 2000).

### 2.    Factual background

As determined in the course of these proceedings, the amended complaint herein concerns Plaintiff's incarceration at the South Central Regional Jail ("SCRJ") between July 23, 2016 (as alleged in Plaintiff's initial and amended complaints)[1] and December 7, 2018, when he was transferred to another correctional facility.[2]  Among various other health concerns, Plaintiff has Human Immunodeficiency Virus ("HIV").  (Pl. Depo. Tr., ECF No. 76-2, at 18).[3]  During his incarceration at the SCRJ, Plaintiff was taking numerous medications, including "Atripla" for his HIV.

Based upon unattributed written instructions provided by Plaintiff with his Amended Complaint (ECF No. 7 at 5-6), he contends that Atripla is a time-released medication that should not be crushed and must be taken whole to be more effective.[4]

---

[1] It appears that Plaintiff may have been received at the SCRJ on or about July 21, 2016, as he underwent a medical screening by PrimeCare staff on that date.  (ECF No. 34-5 at 17).

[2] Plaintiff was not continuously housed at the SCRJ during his incarceration; nonetheless, he contends that, "each time" he was housed at the SCRJ, he had problems receiving his proper medication and meal supplements.  The undersigned will focus on the time period of Plaintiff's most recent incarceration at the SCRJ, which appears to be between July 21, 2016 and December 7, 2018.

[3] Although Defendant Binion provided relevant excerpts of Plaintiff's deposition with his motion for summary judgment (ECF No. 76-2), the undersigned will cite to the complete version of the deposition transcript that was provided as an exhibit to the Wexford Defendants' motion for summary judgment (ECF No. 78-1), using the ECF document number and the actual page of the condensed transcript in references herein.

[4] The undersigned notes that Plaintiff has provided two pages of materials concerning different HIV medications, without attributing the sources of such material.  The first, concerning Atripla, does not specifically state that the medication may not be crushed.  The only material directive that appears on that page is that such medication should be taken at the same time daily.  (ECF No. 7 at 5).  The second page offered by Plaintiff appears to concern a different HIV medication called "Symtuza," which appears to have been prescribed for Plaintiff after his transfer from the SCRJ.  (*See* ECF No. 78-2 at 1).  That instruction page does state that the medication should not be crushed and should be taken whole.  (ECF No. 7 at 6).

Plaintiff's medical records from the SCRJ also include an entry stating, "To ensure correct timing of dosage of HIV medication, give Atripla at same time every day." (ECF No. 34-4 at 4, 12/1/17 "New Intake" medical record entry by Zachary Holbert, APRN, NP-C). Despite these alleged instructions, Plaintiff contends that defendant Thornhill, the Medical Administrator, permitted defendant Fouts-Sneed, and other nurses who have been dismissed as defendants herein, to continually crush his Atripla and float it in water, along with other medications, to make a "cocktail." Plaintiff further contends that he was not given his medication at the same time every day and, on occasion, missed doses completely. He further asserts that the crushing of his medication caused sores in his mouth and throat and led to anal bleeding.

Plaintiff was also prescribed double meal portions and an evening snack bag (to assist with taking his evening medication) (collectively referred to as "meal supplements"). However, he contends that he did not regularly receive his meal supplements as prescribed. He further asserts that the misadministration of his medication, combined with the failure to properly receive his meal supplements, caused him to lose more than 10 pounds in one month and resulted in the failure of his immune system, as allegedly evidenced by blood work showing an increase in his viral load and a decrease in his CD4 levels - in essence, "causing [his] virus to worsen" and "shortening [his] life expectancy." (ECF No. 7 at 9; ECF No. 7-1; PL. Depo Tr., ECF No. 78-1 at 47-48).[5]

---

Plaintiff appears to commingle the two sets of instructions to assert that his Atripla medication should not have been crushed.

[5] The undersigned notes that the blood work evidence upon which Plaintiff relies is a hand-written summary of four sets of alleged lab results over the course nearly three years (both before and after his transfer from the SCRJ). (ECF No. 7-1). Plaintiff has not provided the original lab results or otherwise verified the authenticity of these records.

Plaintiff claims that, when he complained about these issues, Fouts-Sneed got angry and used racial slurs. Thus, on or about November 27, 2018, Plaintiff filed a grievance on the jail kiosk addressing his problems with Fouts-Sneed, and his concerns about his medication and meal supplement issues. (ECF No. 78-1, at 21-23). He also allegedly wrote a two-page letter to the WVDCR that was allegedly received at its central office on December 3, 2018. (*Id.* at 23-25).[6]

Upon receipt of the grievance, Binion, who was then the Superintendent of the SCRJ, met with Plaintiff and told him that he would ensure that he got his "prescribed diet." (ECF No. 93 at 4). Plaintiff contends that this meeting occurred on a Friday and that, after Binion left for the weekend, Plaintiff continued to have problems receiving proper meals. (*Id.* at 30-31). He then wrote the letter to the WVDCR and had his ex-wife and girlfriend contact the WVDCR's central office (specifically Betsy Jividen and Cedric Greene) about his issues. (*Id.* at 19-20, 22, 24-26, 31; ECF No. 93 at 4).

Thereafter, Binion directed that Plaintiff be taken to an interview room for his meals one hour before the normal mealtime for the inmates on his unit. (ECF No. 78-1 at 26). Plaintiff testified that "after I complained and complained that my tray wasn't there, Mr. Binion decided to fix the thing by segregating me to another room to eat by myself." (*Id.* at 25). Plaintiff contends that "somewhere between contacting Betsy Jividen and Cedric Greene, [Mr. Binion] retaliated against me by moving me up the hall to eat my meals." (*Id.* at 32). Although Plaintiff alleged that this "caused confusion" and made a "spectacle" of him to other inmates, he acknowledged that, because of that action, he did receive the proper meal supplements. (*Id.* at 29-30; 32-33).

---

[6] Although this letter was discussed during Plaintiff's deposition, the letter itself does not appear to be part of the record before this court.

Plaintiff's PrimeCare medical records were previously entered into the record by the PrimeCare Defendants. (ECF Nos. 34-4 and 34-5). Some, but not all, of those records were re-submitted with the PrimeCare Defendants' Motion for Summary Judgment (ECF No. 78-2) and Plaintiff's response thereto (ECF No. 94). Although some of Plaintiff's relevant medical records were not again submitted with or relied on in the parties' present motions, the following is a chronological summary of Plaintiff's medical records for the operative time period addressed in the Amended Complaint.[7]

Plaintiff's "Chart Notes" for the operative time period indicate that he had a medical screening (presumably upon arrival at the SCRJ) on July 21, 2016 and that he had already been prescribed Atripla at that time. A "Medical Note" from that date indicates that his Atripla had last been filed on April 21, 2016, and some medication was sent home with him upon his prior release from federal prison. (ECF No. 34-5 at 17). Following this medical screening, an infectious disease consult was requested on or about July 27, 2016 and Plaintiff's Atripla prescription was renewed on July 28, 2016. (*Id.*)

Another "Medical Note," dated November 22, 2017, indicates that Plaintiff was given his Atripla on night shift because the medication was not on the medication cart for the evening "med pass." That entry, by LPN Laura Huffman (who is not a defendant herein) states:

> Pt was given his Atripla on night shift due to the medication not being on the med cart during PM med pass. Pt upset and stated he was being denied medical treatment. Pt advised the medication was not held, just not avail during med pass. That it was now on the cart and would be given at med pass as scheduled. Pt also upset he was not receiving his high protein diet with a bag lunch. Pt advised he was ordered a high protein diet by this nurse. That it no longer came with bag lunch. Pt disagreed with this nurse, stated he always gets a bag lunch. Pt advised that he needed to be approved

---

[7] As noted above, the records not attached as exhibits to the present motions were attached to the PrimeCare Defendants' prior Motion to Dismiss and Motion for Summary Judgment filed on June 2, 2022. (ECF Nos. 34-4 (Exhibit D) and 34-5 (Exhibit E)).

> by a physician for a bag lunch. Pt is already tasked to be seen by ccc [Chronic
> Care Clinic] for this reason. Pt advised if the physician approved the order
> for a bag lunch, he would then receive it.

(ECF No. 34-5 at 17). The next "Medical Note," dated December 1, 2017, states that

Plaintiff "wants his meds at the same time each day. Also addressed diet issues with task

for NSC [Nurse Sick Call]. Pt has a noted 10 lb weight loss in two weeks." (*Id.*) A separate

note contained in Plaintiff's "Medical Sick Calls" records, which were produced as an

exhibit to both the PrimeCare Defendants' and Plaintiff's present motions for summary

judgment, demonstrates that, on December 1, 2017, Nurse Practitioner Zachary Holbert

ordered a "P.M. snack due to medication; double portion at meal time." (ECF No. 73-2 at

4). Holbert also ordered blood work that included checking Plaintiff's CD4 and viral load

levels. (*Id.*)

The following day, December 2, 2017, Plaintiff was again seen in the medical unit.

A "Misc. Note" from that date states:

> Patient seen in medical at this time for 0800 medication. Patient states he
> is getting deprived of medical attention. Patient was informed that his
> medication was timed for 0800, at that time, patient stated that he will be
> suing for depriving him and being under staffed. Patient was told it was
> necessary for him to come down at the same time for his Atripla but the AM
> medication are done on morning med pass. Patient very upset when he left
> medical.

(*Id.*) Another "Misc. Note" from that same date indicates that "Only complaints is [sic]

that he wasn't getting his tray correctly as ordered by Z. Holbert. Pt. aware that order was

placed yesterday and that kitchen aware. This MA spoke with kitchen today." (ECF No.

34-5 at 16). Thus, Plaintiff was authorized to receive his double portions and his evening

snack bag at that point. A separate entry in the "Medical Sick Call" records indicates that

Holbert also stated, "To ensure correct timing of dose of HIV medication – give Atripla at

same time every day." (ECF No. 73-2 at 4).

As addressed in another "Misc. Note" in Plaintiff's medical records from December 3, 2017 (the day after he was authorized to receive his meal supplements):

> Patient was seen in medical. Patient brought snack back to medical to complain of what he received in his bag. Patient was told that kitchen was responsible for this and not medical.

(ECF No. 34-5 at 16). Thus, it appears that Plaintiff received his meal supplement, but was dissatisfied with its contents. (*Id.*)

Further notations in the medical records indicate that Plaintiff's blood was drawn for the ordered blood work, including checking his CD4 and viral load levels, on December 7, 2017. (*Id.*) Then, on December 10, 2017, Plaintiff came to the medical department to receive his morning medication. A notation from that date indicates that Plaintiff "got mad" at the attending nurse, who "poured water over the medication" and Plaintiff "spit his medication into the trash." (*Id.*)

On December 14, 2017, Plaintiff was seen by Dr. Alfred Baldera, at which time he complained about "sores in mouth and pharynx," which he blamed on the "crushing and floating of meds." (ECF No. 78-2 at 3-4). Although Dr. Baldera found "no lesions noted in mucosa[,]" he "suggested crushing and floating each medication individually rather than cocktail." (*Id.* at 4). Plaintiff again saw Dr. Baldera a week later, on December 21, 2017, complaining that he thought he had "oral thrush and peritonsillar abscess." (*Id.* at 3). However, Dr. Baldera found "no evidence of peritonsillar abscess or oral thrush on exam." (*Id.*) He did diagnose Plaintiff with "tinea cruis" (jock itch) and prescribed treatment for that. (*Id.*)

On January 18, 2018, Nurse Practitioner Zachary Holbert ordered an infectious disease consultation, but it is unclear if, and when, that occurred. (ECF No. 34-5 at 16). It appears that Plaintiff was not seen again by PrimeCare medical staff until October of

15

2018.[8]  As relevant here, a "Misc. Note" entry from October 13, 2018 indicates that Plaintiff complained of a history of "chronic sore throat."  (*Id.* at 15).  Later that month, another infectious disease consult was requested, and Plaintiff appears to have been prescribed medication for an unrelated fungal infection.  (*Id.*)

> On November 14, 2018, a "Medical Note" indicates as follows:
>
> Spoke to Patient.  Patient states he wishes to have his medication at nighttime with med pass.  I explained to the patient that he usually wants medication at 4p but explained back to me that it makes him drowsy and wishes to have it at bedtime.  Patient placed on Dr call for tomorrow due to multiple concerns.

(*Id.*)  Plaintiff was then seen by Dr. Baldera on November 15, 2018, at which time he apparently complained about "multiple problems," including "HIV medications," "haemorrhoids [sic]," and "diet order."  (ECF No. 78-2 at 3).  According to the medical records for that date, Dr. Baldera ordered new blood work to check Plaintiff's CD4 level and renewed his "double portions diet."  (*Id.*)  A "Misc. Note" from that date further indicates:  "Snack Bag QHS & Double Portion Meals – Diet Order taken to the kitchen." (ECF No. 34-5 at 15).

Plaintiff followed up with Dr. Baldera on December 6, 2018, at which time he again complained about alleged "thrush in throat" and had "multiple questions about HIV status."  (ECF No. 78-2 at 2-3).  Dr. Baldera found that there was "no thrush noted at this time" and "HIV under control."  (*Id.*)  Dr. Baldera also indicated that the "only way to be certain of near exact medication delivery is to be housed in medical," which Plaintiff allegedly refused.  (*Id.*)  Dr. Baldera further stated that an "ID consult" would be obtained in the "near future."  (*Id.*)  This appears to be the last relevant entry in Plaintiff's medical

---

[8]  It is unclear whether Plaintiff was continuously housed at the SCRJ during this time, or whether he was in another correctional facility, or even released from custody.

records before his transfer from the SCRJ in December of 2018.[9]

        3.      Cross-motions for summary judgment re: retaliation by Binion.

As noted above, Plaintiff has alleged a First Amendment retaliation claim against Defendant Binion grounded in his decision to segregate Plaintiff for his meals. Binion filed a Motion for Summary Judgment asserting that "discovery has failed to adduce a single shred of evidence of retaliation." (ECF No. 77 at 2). His memorandum of law further asserts:

> [T]here is uncontroverted testimony by Defendant Binion establishing that there was no ill intent or retaliatory motive behind Defendant's actions. *See generally Affidavit of J.T. Binion*, attached hereto as Exhibit 1. Defendant Binion has offered uncontroverted testimony that he was the Interim Superintendent of SCRJ from August 10, 2018, until December 18, 2018. *Id.*, ¶ 2. In December 2018, the WVDCR received complaints from Plaintiff stating that he was not receiving his meals and prescribed double meal portions. *Id.*, ¶ 3. As a result, Defendant Binion personally spoke with medical staff to confirm Plaintiff's prescription, personally spoke with the kitchen supervisor to ensure that Plaintiff got his proper portions, and then instructed staff to escort Plaintiff to an interview room for each meal to ensure that Plaintiff received his meals and double portions, as well as speaking with staff to ensure that Plaintiff received his nightly snack. *Id.*, ¶¶ 4-7. Importantly, Defendant Binion has provided unopposed testimony that he did not take any actions against Plaintiff in retaliation, that he only took the actions he did to ensure that Plaintiff received his meals as prescribed, and that he believes that Plaintiff received the meals as prescribed by Plaintiff's doctor as a result of taking these actions. *Id.*, ¶¶ 8, 9, 11. Additionally, the record establishes that staff at SCRJ would sometimes take similar actions with other inmates to ensure they received appropriate religious meals. *Id.*, ¶ 10.

(*Id.* at 3). Binion further asserts that Plaintiff's own undisputed testimony demonstrates that he "did not miss a single meal and received every double portion he was supposed to

---

[9] Based upon the medical records, and evidence from Plaintiff's deposition, it appears that, on or about December 7, 2018, Plaintiff was moved by the United States Marshals Service to either the Boyd or Carter County Detention Center in Kentucky and was subsequently housed at the Western Regional Jail and the Southern Regional Jail. (ECF No. 34-5 at 14-15; ECF No. 73-1 at 15, 28-29). Although Plaintiff's medical records produced by the parties include entries after that date (and into late 2019), those records are not relevant evidence, as they concern his treatment by providers other than the defendants herein.

after being moved to an interview room for his meals." (*Id.*, citing to Pl. Depo Tr., ECF No. 76-2 at 20-21).

Plaintiff filed his own Motion for Summary Judgment concerning Binion's conduct (ECF No. 82), but offers no evidence to dispute that presented by Binion. (ECF No. 82). Plaintiff states that Binion's alleged "retaliation may or may not have been intentional, but never the less happened after I contacted his boss[.]" (*Id.* at 1-2). He further admits that Binion stated that he "would be brought down the hall to eat to make sure that [he] got his prescribed diet[.]" (*Id.* at 2). Finally, Plaintiff admits that "things about my diet were taken into consideration" and he did receive his prescribed diet "for about 10 days" before being moved to another facility. Thus, at best, Plaintiff's motion asserts that he "felt singled out and embarrassed[.]" (*Id.*) Likewise, his deposition testimony simply acknowledged that he was "looked at differently by the inmates" who wanted what he was getting. (ECF No. 78-1 at 31-32).

Plaintiff's response to Binion's motion for summary judgment largely repeats these assertions, blanketly stating: "Retaliation intentional or not, I was segregated because my wife and Mrs. Hensly called the [WVDCR] central office." (ECF No. 93 at 4). Binion's response to Plaintiff's motion reiterates that "the uncontroverted factual testimony by both Defendant Binion and Plaintiff . . . failed to establish a meritorious retaliation claim against Defendant Binion." (ECF No. 89 at 2).

To state a plausible First Amendment retaliation claim, Plaintiff must establish: (1) that he engaged in protected First Amendment activity; (2) that Defendant took some action that adversely affected his First Amendment rights; and (3) that there was a causal relationship between his protected activity and Defendant's conduct. *Martin v. Duffy*, 977 F.3d 294, 298–299 (4th Cir. 2020) ("*Martin II*"); *see also Constantine v. Rectors &*

*Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). Where retaliatory conduct would "deter a person of ordinary firmness from the exercise of First Amendment rights," the claim may proceed. *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) ("*Martin I*") (quoting *Constantine*, 411 F.3d at 500).

However, retaliation claims in the prison context "should be treated with skepticism because even legitimate acts of discipline taken by prison officials are in some sense retaliatory." S*ee Cochran v. Morris,* 73 F.3d 1310, 1317 (4th Cir. 1996) (finding that the district court did not abuse its discretion in dismissing plaintiff's claims of retaliation where they lacked a nexus to the misconduct alleged); *see also Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002) (To survive summary dismissal, a plaintiff asserting First Amendment retaliation claims must advance non-conclusory allegations establishing each element of such claim); *accord Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003). "[T]he plaintiff must show that the defendant's retaliatory action was substantially motivated by the plaintiff's decision to exercise a constitutionally protected right, and that the action impaired the exercise of that right. *See ACLU v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993). As recently addressed in *Martin II*, however, the Fourth Circuit has recognized that, once a plaintiff establishes a *prima facie* case of retaliation, a defendant may rebut that presumption by demonstrating that "it would have reached the same decision . . . in the absence of the protected conduct." 977 F.3d at 299. This is known as the "same decision" test. The *Martin II* Court further stated:

> [C]ourts must take care to "afford appropriate deference and flexibility to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (citing *Sandin v. Conner*, 515 U.S. 472, 482, 115 S. Ct. 2293, 132 L. Ed.2d 418 (1995)). But the obligation to view prison officials'

> explanations charitably does not free officials from providing any explanation at all. Once a plaintiff establishes his protected conduct was a substantial or motivating factor in the defendant's decision to take adverse action, the defendant is appropriately tasked with explaining why her decision was not animated by retaliatory motives.

*Id.* at 301.

Even if Plaintiff can establish that he did engage in First Amendment protected activity shortly before he was sent down the hall to have his meals, he has not sufficiently established a First Amendment retaliation claim because it is clear from the undisputed evidence of record that Binion took that action for legitimate penological reasons to ensure that Plaintiff properly received his prescribed diet. Moreover, Plaintiff has not disputed Binion's contention that similar actions were taken with other inmates who needed to receive appropriate religious meals. Binion denied that such action was retaliatory for any reason, and Plaintiff has not sufficiently rebutted that evidence. Moreover, Plaintiff admitted that, after this action was taken, he did receive his meals as ordered. Thus, Binion contends that Plaintiff has failed to sufficiently establish the required elements of a retaliation claim under the First Amendment.

Consequently, Binion further asserts that he is entitled to qualified immunity. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The qualified immunity doctrine affords defendants "'ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law'" and it "insulates them from 'bad guesses in gray areas.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *Marciello v. Sumner*, 973

F.2d 295, 298 (4th Cir. 1992).  (ECF No. 171 at 9).

As asserted by Binion, a clearly established right should not be defined broadly or "at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), and is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Covey v. Assessor of Ohio Cnty*, 777 F.3d 186, 196 (4th Cir. 2015).  (ECF No. 77 at 10). The Supreme Court has confirmed that "a case directly on point [is not required], but existing precedent must have placed the statutory or constitutional question beyond debate."  *al-Kidd*, 563 U.S. at 741.  Therefore, when confronted with a claim of qualified immunity, a court must ask the following question: "Taken in the light most favorable to the party asserting the injury, do the [specific] facts alleged show the officer's conduct violated a [clearly-established] constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Because Plaintiff has failed to establish any facts to support a clear violation of the First Amendment, or any other clearly-established constitutional right, by Binion, he is entitled to qualified immunity.  Therefore, the undersigned proposes that the presiding District Judge **FIND** that there are no genuine issues of material fact, and that Defendant Binion, not Plaintiff, is entitled to judgment as a matter of law on Plaintiff's First Amendment claim.

4.    Cross-motions for summary judgment re: Plaintiff's medication.

Plaintiff and the PrimeCare Defendants have also filed cross-motions for summary judgment concerning Plaintiff's claims of deliberate indifference to a serious medical need in violation of the Eighth Amendment.  To sustain an Eighth Amendment claim, a prisoner must show two things: (1) "the deprivation must be, objectively, 'sufficiently

serious;'" that is, "denial of 'the minimal civilized measure of life's necessities;'" and (2) the defendant had a "sufficiently culpable state of mind;'" that is, a "deliberate indifference to inmate health or safety." *Id.* at 834. (Citations omitted.) To satisfy the first element, the prisoner must show "significant physical or emotional harm, or a grave risk of such harm," resulting from the challenged conditions. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995). To establish the second element of deliberate indifference, a plaintiff must show that the defendant was personally aware of facts indicating a substantial risk of serious harm, and that the defendant must have actually recognized the existence of such a risk. *See, e.g., Farmer*, 511 U.S. at 838-40; *Conner v. Donnelly*, 42 F.3d 220, 222 (4th Cir. 1994). The defendant then must have failed to take "reasonable measures" to alleviate the danger. *Farmer*, 511 U.S. at 832.

A prison health care provider's actions may constitute deliberate indifference to a serious medical need if the treatment is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990); *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11 Cir. 1986) (collecting cases). "Serious medical needs" are those which have been diagnosed by a physician as mandating treatment or that are so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Gaudreault v. Munic. of Salem, Mass.*, 923 F.2d 203, 208 (1st Cir. 1990). Deliberate indifference may be demonstrated by either actual intent or reckless disregard. *See Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985). A defendant acts recklessly by disregarding a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position. *Id.* Nevertheless, mere negligence or malpractice does not violate

22

the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. at 106; *Miltier*, 896 F.2d at 851-852.

The burden of demonstrating deliberate indifference to a serious medical need is very high. It is well-settled that:

> A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. *See Farmer [v. Brennan]*, 511 U.S. [825] 832-35 [(1994)]; *Sosebee v. Murphy*, 797 F.2d 182-83 (4th Cir. 1986); *Loe v. Armistead*, 582 F.2d 1291, 1296-97 (4th Cir. 1978).

*Rush v. VanDevander*, 2008 WL 495651 (W.D. Va., Feb. 21, 2008); *Banks v. Green Rock Corr. Ctr. Med. Dept.*, 2007 WL 2903673 (W.D. Va., Oct. 3, 2007). However, as noted above, negligence is not sufficient to demonstrate deliberate indifference to a serious medical need. *See Webster v. Jones*, 554 F.2d 1285 (4th Cir. 1977); *see also Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998). Likewise, disagreements between a health care provider and the inmate over a diagnosis and the proper course of treatment are not sufficient to support a deliberate indifference claim, and questions of medical judgment are not subject to judicial review.

The PrimeCare Defendants assert that "discovery in this matter has failed to elicit any evidence that would support the Plaintiff's allegations that his constitutional rights were violated by Defendants Thornhill and Fouts-Sneed." (ECF No. 79 at 3). While the PrimeCare Defendants do not dispute that Plaintiff's HIV is a serious medical need sufficient to satisfy the first prong of the Eighth Amendment standard, they contend that "it is clear that [they] in no way responded to his serious medical need with deliberate indifference." (*Id.* at 8). They further contend that "all of his complaints were addressed by nurses, PrimeCare physicians and an outside infectious disease physician at Marshall

Health." (*Id.*) They also assert that Plaintiff cannot recover monetary damages for emotional distress because he has not established any actual physical injury as required by 42 U.S.C. § 1997e(e). (*Id.*) Their brief notes that "[a] plaintiff seeking compensatory damages for emotional distress cannot rely on conclusory statements that the Plaintiff suffered emotional distress [or] the mere fact that a constitutional violation occurred, but rather, the testimony must establish that the Plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated." (*Id.* at 9, quoting *Knussman v. Maryland*, 272 F.3d 625, 640 (4th Cir. 2001) (other citation omitted). Their brief further states:

> In this case, we only have the Plaintiff's conclusory statement that he suffered emotional distress. In his Amended Complaint, there was no claim of actual physical injury, other than a fluctuation in his viral load, which is not uncommon in patients with resistant HIV virus. His conclusory statement that his medication was not administered appropriately and that this caused loss of life expectancy is not sufficient to support his claim or monetary damages for emotional distress and this claim should be dismissed.

(*Id.* at 9).

Although Plaintiff contends that the crushing of his medication caused sores in his mouth and throat and anal bleeding, Defendants assert that his medical records do not support these assertions. Their brief states:

> However, the medical records for the applicable time period show that while he complained of sores in his mouth, which he blamed on the crushing and floating of his meds, Dr. Alfred Baldera saw no lesions in his mucosa at his medical appointment on December 14, 2017. There are no complaints of anal bleeding, although in medical appointment on 11/15/2018, he was treated for hemorrhoids. *See* Medical Records attached hereto as **Exhibit B.**

(ECF No. 79 at 4 and 79-2, Ex. B). Plaintiff further acknowledged that he had no long-term health effects from these alleged medication errors as he is now asymptomatic for

HIV. (*Id.* at 4 and ECF No. 79-1, Ex. A at 55). Thus, they contend that he "admits he suffered no worsening of his HIV as a result of PrimeCare nurses' administration of his medication." (*Id.*)

Plaintiff's cross-motion for summary judgment makes blanket assertions that his "medical condition worsened" under the care of the PrimeCare Defendants. (ECF No. 83 at 2). He further contends that "nutrition is a very big part to stay healthy as well as my medication to be taken as prescribed and not manipulated to give me a chance at life and to stay healthy." (*Id.*) His response to the PrimeCare Defendants' motion repeats his allegations that "these actions caused me to lose weight and my medical condition worsened causing further causing pain and suffering and emotional distress." (ECF No. 94 at 1).

Plaintiff's response again relies on the pharmaceutical paperwork concerning the "manipulation and timing of" Atripla. (*Id.* at 2). He further relies upon his own interpretation of his medical records and hand-written lab results. He contends that "Defendants did state that I had no lesions in my throat, but I had chronic sore throat problems, so they gave me antibiotics to cure it . . . 6 to 7 medications crushed together is explained as a cocktail to me it was very toxic." (*Id.*) He claims that deliberate indifference may be demonstrated either by the actual intent of the nurses who crushed his Atripla when the instructions said not to, or their reckless disregard for the same, and the failure to ensure that he received his medically-prescribed meal supplements. At bottom, he summarily contends that these Defendants "failed to follow through to make sure he had proper medical care. . . ." (*Id.* at 3). Thus, he contends that the PrimeCare Defendants are not entitled to summary judgment. (*Id.*)

During his deposition, Plaintiff testified as follows about his medication administration:

> Prior to coming to South Central Regional Jail, my medications were swallowed whole, no problem. Coming to South Central Regional Jail, peritonsillar abscess or abrasions or swelling in my throat from having the cocktail mix, that started. Dr. Baldera is a doctor under PrimeCare Medical, noticed that inside my throat there wasn't any swelling or abrasion or anything like that, but I could feel it. I knew it was coming. And a peritonsillar abscess for a person with HIV is very, very serious. Now, regardless of that, the crushing of the medication started causing different types of irritation. So Dr. Baldera said, "Hey, let's just give them to him one at a time."

(ECF No. 78-1 at 44-45). Thus, Plaintiff's deposition testimony suggests that he believed he was suffering from, or was at risk of, a peritonsillar abscess and had oral thrush. However, his medical records from December 21, 2017 clearly indicate that no peritonsillar abscess or thrush was found. (ECF No. 78-2 at 3). Additionally, as previously noted by the Wexford Defendants, Plaintiff's medical records demonstrate that no lesions of any sort were seen in his mouth or throat. (*Id.* at 3-4, entries from 12/1/17 and 12/14/17). Moreover, nearly a year later, Plaintiff was diagnosed with external hemorrhoids, which the medical records in no way associate with his medication administration and there is no other evidence of anal bleeding. (*Id.* at 3).

While the medical record from December 1, 2017 indicates that Plaintiff had lost 10 pounds in one month or less (*Id.* at 4), as previously noted by the Wexford Defendants, his medical records further indicated that he gained 30 pounds between December 12, 2017 and July 2, 2019 and that his Body Mass Index ("BMI") indicated that he was overweight. (ECF No. 48-1). Without any expert evidence to support his assertions, and despite his numerous other health issues, Plaintiff merely speculates that the fluctuation in his blood work and these other various health complaints were caused by the

misadministration of his medication and the denial of consistent meal supplements, which is insufficient to establish the essential elements of a deliberate indifference claim under the Eighth Amendment.

Therefore, even if Plaintiff can demonstrate that the Wexford Defendants permitted or engaged in the crushing of his Atripla medication (along with other medications), he has failed to demonstrate that he suffered any actual injury because of that conduct or that the Wexford Defendants were deliberately indifferent to a serious medical need. Based upon the undisputed evidence of record, it appears that Plaintiff's claims are grounded in nothing more than his own disagreement with the judgment of his medical providers, which is insufficient to give rise to an Eighth Amendment violation. Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the Wexford Defendants (Fouts-Sneed and Thornhill), and not Plaintiff, are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claims.

## III.    *RECOMMENDATION*

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the Motion for Summary Judgment filed by Defendant J.T. Binion (ECF No. 76), **GRANT** the Motion for Summary Judgment filed by Defendants Tina Fouts-Sneed and Jessica Thornill (ECF No. 78), **DENY** the Motions for Summary Judgment filed by Plaintiff (ECF Nos 82 and 83), and **DISMISS** this matter from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure,

the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).  Copies of such objections shall be provided to Judge Copenhaver and the opposing parties.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Plaintiff and to counsel of record.

June 12, 2024

Dwane L. Tinsley
United States Magistrate Judge